The York Times is a registered Trademark of the National Archives of Canada.   It is not intended for use by minors below 18 years of age. It is intended for use by minors below 18 years of age. It is not intended for use by minors below 18 years of age. It is intended for use by minors below 18 years of age. A number of the content claims require, in order to get to, say, Step 3 or 4, that a handset take a certain action. So there is, not as to all the claims, not perhaps as to your 450 Claim 1, but as to quite a number of them, a handset action that has to be taken for the complete performance of the content claims. That's true, Your Honor, but what is lacking is, and I think that was actually, as Your Honor began the question, by noting that within the language of this Court's cases like Advanced Software Design or Unilock, the content providers are not using a handset. They are not employing it to carry out any step of the patent, and the claims are written in such a way that the handset is the environment in which... But why should that be dispositive? That is, the particular concept of use, say, for 271A, why should that be controlling? Let's assume, for example, that the handsets, as programmed or configured to embody the handset patents, had no other use but to perform the role that the content claims, some of them, require a handset to perform. Let me say first of all that that's not the case here, and I think it's important to note that, and the analysis might be different in that circumstance because it might go to the extent to which there should be some sort of an implied license if there would literally be prevention of use to enforce the separate patents. But it's important to start from what ought to be undisputed, which is that there are separate patentable inventions on the content side on one hand, on the handset side... I wonder, though, stick with the hypothetical for a minute about where the handset has no other substantial use but to play the role that a number of the content claims require a handset to perform. Wouldn't that even, though it wouldn't require the accusation that the handset holder, a contributory infringer, putting aside the knowledge requirement? Well, I don't think you can put aside the knowledge requirement in terms of the contributory infringement issue, but I think that the critical point with regard to Your Honor's hypothetical is that it is not a problem for exhaustion doctrine to deal with. That is to say that exhaustion doctrine provides a right for with respect to when there's an authorized sale under a particular patent there is a right for the handset user to employ the handset, resell the handset, without any restraint imposed by the patent holder. There might be other issues in other circumstances that go to whether there are implied licenses. You don't think that exhaustion would in fact apply, you don't think that there would be a restraint on the handset owner if by asserting a patent against somebody else the handset owner was thereby deprived of all substantial use of the handset? I don't think there would be a restraint within the meaning of exhaustion doctrine, Your Honor. What there might be is it might deprive the owner of all practical use of the device, and that might be an issue, but I think that the cases like Aiken and what this court recognized as the principle in separate patents, the fact that the enforcement of a separate patent might lead to, might prevent any use of a patented device sold under a different patent is not a basis for implying a license or for saying that there is a right to practice that other patent, and that's really quite analogous to Your Honor's question. That is to say the hypothetical is the only way in which you can use the handset, and this is a hypothetical that is contrary to fact here, and that's important. Because the hypothetical is the third party providers of the rich content. Because there are all sorts of ways in which the handset claims may be practiced that do not implicate on the other side the practicing of the content claims, and that's critical to recognize. But again, dealing with the hypothetical and how do I think about the potential problem of a case where the hypothetical arises? And the answer, I think, first of all is where you have related technologies and separately patented inventions on both sides, there may be a right for the patent owner to enforce both, and that's what That does not mean that I have to give up the right to enforce my patent on the needle. What if hypothetically we were just looking at a single invention? Maybe we look at the patent and all the claims and just say this is really just a single invention about two-way communication, and you have successfully drafted claims that kind of look at that invention from two different angles. But it's still just a single invention. Then would you agree that there is exhaustion in that situation? Because it felt like a lot of your focus is that these are separate inventions, these are separate patents, and so therefore if I have a patent on a knitting machine and then I have a separate patent on a separate invention for the needles, then selling one doesn't exhaust the other. But what if it's all regarded as a single invention? I will answer Your Honor's question on that hypothetical, but I think it's important to recognize that one of the reasons why this case can be resolved rather straightforwardly is that's not the situation we have. There are separate inventions indeed. The PTO issued restriction requirements that in some cases recognize the difference between the handset inventions and what is practiced on the handset and the content inventions. But there are doctrines that could deal potentially with the issue that you talk about. Perhaps one of the patents is invalid for double patenting, if that were the case, if this is simply a flip side invention. In this regard, I think that the answering machine hypothetical in the defense... It might be a defense, Your Honor, if the patent is issued and not subject to a terminal disclaimer, but there could be a defense of invalidity based on double patenting. But in any event, the point that I'm trying to get at is that in a circumstance like that, and I think the answering machine hypothetical actually helps to illustrate this. I think that it's far-fetched to think that there would be a patentable method for leaving a message on a machine. So if you think about it, if the machine in the hypothetical were unlicensed and someone called and left a message, could they be sued for direct infringement? I think it's quite questionable, but let's assume that that's the case. The unrestricted sale or the authorized sale of an answering machine might well confer a license for it to be used in the manner in which it's supposed to be used, and that could include the right for third parties to leave a message because there's nothing additional that goes on in that circumstance. But that, again, is not the case here, which is why this case should be decided based on the fact that the content inventions are not simply the flip side of the handset inventions. But paying attention, again, to the claim language, and we laid out the language of the 450 patent exactly for the region that Judge Taranto perceived, which is that it really doesn't require a handset to be present at all for a team. Think about other ones because the only effort you make to say some claims can survive and even if others go down is the effort that says mixed patents might be different from pure content claim patents. You have an argument about that, but you otherwise don't make any distinction within the whole world of content claims. So if there is some for which the handset plays whatever the sufficient role would be, then all of them are going to fall. There are no such patents, Your Honor, where the handset plays a sufficient role. The point of invention, and I don't think that the substantial embodiment analysis really applies properly here, but if you think about it through that lens, what was inventive about the content patents was the manner in which on these content systems information was managed, it was updated, how it could be deleted, how the location could be handled so that it could be delivered in response to a request. And so what's inventive about those content inventions deal with the manner in which that content is managed. What's inventive about the handset inventions is the way in which a user requests content, controls it through by directing the replying, forwarding, etc. There's a user interface that's claimed. There are steps that relate to deleting notifications without deleting content and vice versa. So there's an effort on the part of the defendants understandably to say this is just one invention that deals with two-way communication systems, but the claim language belies that and there really are quite separate inventions and again that's reflected by the fact that the PTO has granted and has indeed in some cases required separate patents on separate inventions. If you can go back to the telephone answering machine hypothetical, you mentioned in passing that you thought that if the caller added nothing more, that the caller might in some cases, a third party might have protection under exhaustion. Can you give me an idea? Maybe I didn't understand what you were saying, but you were suggesting that there might be certain circumstances in which a third party would have exhaustion rights. No, and if I said that I certainly misspoke, so I appreciate the opportunity to clarify it. There might be an implied license, which is a different matter. That's what I wanted to clarify. You say that there would be some doctrinal approach, perhaps. Potentially. But it would be in the nature of an implied license as opposed to the application of the exhaustion doctrine. And as Quanta makes clear, the consequences of the distinction are significant. Now, before Quanta, as I think the decisions of this court reflect, the distinction was not necessarily considered particularly, necessarily a great moment. But post-Quanta, I think the distinction is important. And what's going on here is, and it's precisely for that reason that expanding exhaustion doctrine in the way that the district court did and the defendants are seeking here is really quite dangerous in terms of upsetting existing licensing arrangements and existing expectations. I want to make sure I understand your position so I can understand the consequences of it. I guess you're saying if your claims were really nothing more about sending a notification message first and then letting the user decide when to access the real message, the real content, and then you had two claims drafted, one from the handset user's perspective and then another method claim from the content provider's perspective, and then you licensed the handset user for that claim. In that very convention, would you still be able to go after the content provider in that case? In all likelihood you would, for the same reason that in the case of an FM radio patent that involves transmission and reception. Okay, so then for all these computer network patents that have all kinds of communication paths running around between a first party, a second party, maybe even all those first, second, third, fourth, and fifth parties as method claims, then the patent owner could succeed in basically going after all five parties? Well, it would depend, Your Honor. Again, it would depend on if there was something that was inventive about what each of those parties was doing. Okay, so there's got to be something inventive about each of the five perspectives in my hypothetical. In my earlier hypothetical, where it was just a simple invention with just a handset user and a content provider, and it was just about sending the little message first and then sending the big message second, and there wasn't anything you could argue that was extra inventive from either end in the drafted claims. Would you say, okay, then you have exhausted the content claim in that instance? I don't think that you've exhausted the content claim, Your Honor. Whether there would be some issue about whether that could be licensed separately, I guess it depends. Again, in the context of, think about an FM radio patent. One might say, I want to be the only FM broadcaster, and I'm going to license lots of people to produce receivers, but I want to be the only one to broadcast. There should be nothing wrong with that, as long as it is clear what rights are being granted. It's because they make clear that it's why there's no implied license argument that we've heard from the defendants, because they make clear that the rights that are granted are restricted to the license field. What they also make clear is that where licensees wanted the rights to be able to practice the content claims, they sought them, sought those rights, and they paid additional monies to be able to practice both sets of claims. You can easily imagine a handset manufacturer that might also want to be able to provide content. They got those rights. What is your formulation of how to tell whether a second patent asserted against somebody else? Is it always the case that as long as there is another patent putting aside validity issues, there simply is not exhaustion by enforcing the other patent, regardless of the relationship between the two? I think I would subscribe to that, Your Honor, that it is not an exhaustion problem. That is, exhaustion talks about the freeing from the restraint of the patent holder, the use or sale of an article. Bowman, I think, the Supreme Court makes this clear. Exhaustion is about the use or sale of an article. Even if the use of the article would be an inducement to or meet the contributory infringement standard, and again, putting aside knowledge for a minute, would constitute an infringement, direct or indirect, of the other patent. I think so, Your Honor, because the key there is that in the indirect case, there has to be intent. As soon as you make the allegation, then you are going to have the requisite knowledge. The knowledge is going to come as soon as there is information exchanged about the thing. But I think that in the circumstance that you are talking about here, where there is a sale of articles, that is a broad sale of articles, going against individual holders of the article is unlikely to be a practical possibility. And the other point that I do want to emphasize again is that there may be other doctrines that are available in a circumstance of real inequity, but there is no inequity here because the handset manufacturers were licensed to sell handsets without having to worry about any infringement claim being brought against their users, and that is the circumstance here. What is the state of the record procedurally, substantively, and on the question of substantial uses of the handset that constitute substantial uses that would not, other than playing a role in somebody's performance of the contact claim? Substantial non-infringing uses in that particular sense. In Dr. Grinan's declaration, he discusses this issue. He talks about the fact that there are handset claims that can be used without implicating any infringement by the content providers. And we're on summary judgment, so we have to take that as a fact for current purposes. That's true, but I think the court could also simply look at the language of the claims and find that as a matter of law, because there are elements within the content claims that need not at all be practiced in order for the handset user to execute each of the elements of many of the content claims, because they focus on what the user does with the information identifier in order to obtain content. But whether that content is stored and managed in a way that would implicate the content patents is not at all a given, and there are lots of ways in which handsets receive content using what we would say are infringing methods all the time that don't involve infringement by any content provider. So this sort of notion that there's one invention, it's just fundamentally not the state of the facts here, and that's why I think the court can look at this case through a fairly narrow lens where the holding that's required here only goes to a circumstance where there are content claims that are separately patented that involve distinct inventions, handset claims that are, again, separately patented distinct inventions, and where there is an authorized sale under the handset claims, that does not exhaust those separate content claims. That's an old principle. How do we know that there are really such patently distinct claims as you say? I know that the PTO issued restriction requirements, but I just happen to know, I don't know why, but I happen to know that the PTO issues those kinds of administrative requirements for all sorts of reasons and not just for the specific reason that they have made a specific finding that different categories of claims are patently distinct from each other. If you look at the, again, and this is in Dr. Grimman's declaration, he talks about this, if you look at what the PTO said was patently novel and inventive about the content claims, it was the way in which the content provider used systems to manage content, and the simply look at the claims and you read the specification, it is clear from that that there are improvements on both sides of what's going on here. There are improvements on the content side and there are improvements on the handset side. One could be novel and one not. Do you think that's true for every single one of your content claims? That every single one of your content claims has a two-way communication notion of sending a first notification first before sending the real message? What I can say, Judge Ken, is that on my understanding, there are many, many claims here. On my understanding and based on the ones that I've looked at with CARE that were asserted in this litigation, that there is no content claim that simply says send a notification and deliver content. There's always something more that the content provider has to do. There's always something more, but that something more could be nothing more than just the conventional build-out of the gist of the invention. No, I think it's quite fundamental. It's a quite fundamental something more that goes to the manner in which the content is managed. The deleting of content when it's out of date. Updating content without sending an additional message. Receiving an information identifier from a first content storage system. It is simply a caricature of the invention to say it's about sending a notification, getting a request and sending the data. That's not the invention and that is why it is critical to look at the claim language in determining back up. I think that on our broadest theory, you don't have to look at the claim language except to determine whether the handset is being used in practicing the claim. But once you determine that the handset is not being used by the accused infringer. There's a quite meaningful sense in which the handsets are in fact being used in practicing a lot of these claims just not by the accused infringer. It was my passive voice that was the error. Not an unimportant point in the briefing of this case. I agree with you and that's why I should have said that the infringer is not using the device that has been sold pursuant to an authorized sale in practicing the asserted claim. That is the case here and that is why the district court got it wrong and it is on that basis that the court should reverse. Just one last question. We haven't mentioned Keurig yet and just wanted to hear your thoughts on why can't we regard this as somewhat analogous to Keurig in the sense that what happened there was the patent owner was trying to put a restraint on the owner of the patented brewers by asserting the method claim afterward and maybe here what's going on is there's some kind of restraint on the cell phone users who have purchased the functionality that's been patented through the handset claims. It's not just the phone itself. It's a certain functionality that attaches to the phone and there is some kind of at the very least an indirect restraint on the cell phone users because now they contemplated certain expectations when they bought that phone and now there's a restraint placed on them. Let me first say that the fundamental distinction between this case and Keurig is that Keurig involved a claim of indirect infringement based on the device owner's direct, the brewer owner's direct infringement. That's fundamentally different from what we have here. There's no claim that the handset users are infringing any of Helfrich's patents and that's a critical distinction between Keurig in this case and also between Lifescan in this case, Your Honor. Again, Keurig does not rest and no exhaustion doctrine rests on the idea that because you have purchased a device, you therefore anything that the patent owner does that might somehow diminish your ability to directly or indirectly, I should say at least indirectly, that might diminish your enjoyment of the device is therefore exhausted. Again, that's the principle that's old and aching. If you have a separate patent that goes to some component that is even necessary for the use of the device, if you have not separately licensed that, the purchaser of the used the device and this court reaffirmed the validity of that distinction in its discussion in Lifescan and I think it is an answer to Your Honor's very broad formulation of what exhaustion doctrine might offer. Thank you, Mr. Penner. We'll restore at least your normal rebuttal time and we'll see how much more there is to even things out and you can divide your extensive time any way you wish. Thank you, Your Honor. The formulation that Judge Toronto requested comes, for example, from this court's decision in Hewlett-Packard, quoted in the briefs, which says that once a patent field licenses an article, it cannot then assert patents that would interfere with the intended licensed use of that article. That's what Helfrich is trying to do here because it is licensing the handsets for use in this two-way communication system. Just remind me, assert patents against the licensee or against the third party in the quote that you're referring to. It would have been the same defendant situation. And remind me, was that under an exhaustion doctrine? Yes. What you had in the Hewlett-Packard case specifically is you had apparatus claims on a printer cartridge and you had separately, you had methods of refilling the printer cartridge and the argument there and what the court held was that exhausting the patents on the apparatus claims on the actual printer cartridge exhausted refilling them because a natural intended use of having a printer cartridge would be the ability to refill it. There's no one case directly on point. What about the knitting needle case, the knitting machine? There are two different categories of cases between this court and the Supreme Court about multiple patents. Those cases that you referred to, those are essentially the replacement parts cases where an article is sold, it's licensed, and it can be used. There's no question that it can be used right out of the gate. The question is if you need a replacement part, for example, who do you have to buy the replacement part from? But the article on day one can actually be used as is. They're saying here that when they licensed these handsets to engage in the claimed two-way method of communication, the handsets weren't capable of doing anything relevant unless and until they were paid a second time for the exact same communication by the other party at the end of the line. And that's what puts this in the category of the cases where the court applied exhaustion across patents. For this court, it would be Hewlett-Packard. For the Supreme Court, it's the Eppel Gasoline case where you had a totally different set of defendants, a different set of patents, a different accused product. But it's the same point. It involves a lead additive to gasoline. Back when people thought that was a good idea. And there were patents that covered a lead additive that were licensed to refiners who then refined gasoline. What the Supreme Court held was that the patentee could not later seek to license people downstream who had not just that composition, but had an overall gasoline product. Different people, different product. And there was another patent that claimed only the gasoline product, not also the refiners. Was that also a case in which the new suit was asserting infringement, if that's what it was? I don't remember if that was an antitrust case or not. But it would have been an assertion against the downstream purchaser? The license scheme that was held to be invalid would involve, you could say, a downstream purchaser, but of a different product with a different patent. But isn't that what's distinctive here? Namely that there's no accusation, direct or indirect, against the handset's owners. No one's got a case right on point about that. There's no case on point because it's a modern fact pattern stemming, as Judge Chen's question suggested, from the modern era of this proliferation of claims involving communication over the internet or over computer networks. But it's governed by the same principles of law that have long applied, which is that the exhaustion doctrine looks to substance not formed to prevent double recovery. And it does so in part. Let me just explore that for a minute. The question of double recovery, it can't mean that we have to figure out or a court has to figure out what the proper dollar amount is and when that dollar amount is reached. No more can be gotten because there is no mechanism for figuring out the right price. So double recovery must mean, essentially, it's a conclusion you draw after you have otherwise determined that whatever the unit is that's supposed to get a reward has gotten whatever reward it has gotten. And now you're trying to get for the same unit as opposed to a different unit. And I take it the gist of the other side case is that there's a different unit, all of the inventions on the content side, and they get a reward for that. The point is, though, there are two ways of looking at it. One is they're shaking the block. And I agree, it doesn't matter how much has been paid. In LifeScan, for example, there was exhaustion where no payment had been made. It was a license for free. That's it. The point is once you license a use, you cannot interfere with that intended contemplated use. And here they're saying that they licensed the handsets to actually do nothing. But they stated that way. Does that run up against the needle case? No, the difference is here they're saying right off the gate that license you just couldn't have done anything with unless until a second payment was made. The knitting needles case is the replacement parts cases. The reason that there's a distinct set of patents and there are different sets of cases involving multiple patents, in those, as of day one, you could use that machine as intended to do what you could. Later on, the question is who do you have to buy a replacement part from? Here they're just arguing for. Particularly based on that quote from Hewlett-Packard. Let's take a really simple hypothetical and you tell me how this plays out vis-a-vis your theory. Suppose that I have an innovative form of walkie-talkie. And so I sell it to you. Your plan is to use that walkie-talkie to communicate with other people who have the same walkie-talkie. And you pay a lot for the walkie-talkie. But you discover that I'm charging other people a whole lot for their walkie-talkies and no one buys them. Have I, in making my sale to you, exhausted my patent rights because your right to practice what you expected to be able to practice with that walkie-talkie has been defeated by the fact that I'm insisting on a high premium from others? Not just by that. The question would be this. Analytically, how would you say, no, even though I have basically a very expensive paperweight, when no one else buys the walkie-talkies from me, nonetheless, and even though I expected to be able to use it, nonetheless, there's no exhaustion. Well, that may be the key point. And what it depends on is if this walkie-talkie is extra good, but it can communicate with lots of other walkie-talkies. No, it can only communicate with other walkie-talkies of my design. Of the exact same type. Right. Well, for me to communicate with anyone else, obviously the other person is going to have to apply our walkie-talkie. That's right. But what you can't do, so it's a little different there in that here they don't claim to have a patent on a server, for example. Right. So, I mean, for me to communicate with the phone, it's true, I have to, someone else out there has to have the server and be able to perform this method. So they'd have to buy the server for whoever was entitled to sell it to them. But the analogy to that situation would be if they actually had a separate patent on the only server that you could use to communicate, to do the receiving content claims. Right. Here, it's not the case because I can communicate, I have to be able, me and the other party have to be able to use this method. But there's no other claim to an extra good server or an extra good phone that would add a new, a different element. Because, of course, someone has to buy a phone, someone has to buy a server if someone is authorized to sell it. So you would say there's no exhaustion in my hypothetical? Well, I mean, technically speaking, I mean, there would be no exhaustion of a claim on the other server. It doesn't really matter. I could sue each of them in turn who used that apparatus or copied my machine, I could sue them freely, right? Without impairing your rights. You could certainly sue them for... Or their rights. You could certainly sue them for, on an apparatus claim, is what I was going to say. On a use claim, it's less clear. You could sue them on the apparatus claim because they are, as such, they own an infringing apparatus. But once you've licensed me to use this two-way method of communication... Have I given up my use claims against everybody else who uses the same kind of machine? You've given it up. If you license... I mean, here it's... If you license... Well, here, if you license everyone on one side of the transaction, right, then you've exhausted your claims concerning these types of communications. If you license, say, one, as relevant here, one handset manufacturer, then you would exhaust your claims that turned on the use of that handset manufacturer's phones because it takes two to tango. Each of these communications are multiparty participations. You can recover once for each. Otherwise, over, say, a modern computer network, with, say, four or five participants, which is not all that unusual, you could go and get four or five recoveries for the exact same thing. And if the exhaustion doctrine prevents anything, it ought to be that. There were... There was some discussion before about non-infringing alternatives, and to be clear, the Grindon Declaration identifies a couple types of non-infringing alternatives, but they all involve performing the claim elements. The point of Grindon just seems to be that those would be divided infringement scenarios, where different people split up the elements, there'd be no direct infringement. I thought the content claims were geared to the same person sending the notification and supplying the message whose availability is being given notice of. Well, to avoid divided infringement issues, I mean, the claims are all written from the perspective of one party. No, no, no, no, no. That they don't cover my sending you a message that Judge Chen has a neat thing on his server that you should check out. Well, there's... Under their infringement allegations in this case, it's actually not clear, but assuming that to be true, the point is that still that they all contemplate, I mean, someone performs each thing that's listed here, even if it would avoid infringement because it would create a divided infringement issue. But in Kwanzaa, squarely held, that that type of thing is not appropriately considered a non-infringing alternative. It's footnote six in Kwanzaa, because still the method is being performed, even if it's not being infringed by one entity. And the reason is, as this Court sort of elaborated on in LifeScan, what we're looking to is what was contemplated here as the intended use of the article. And Curie is similar. And here, when what the handset owner wants to do is absolutely the intended use of the article, and it's part of this two-way communication system where it takes two to tango, that's what's precluded. Judge Toronto had asked a little bit about the claim language. Six of the seven asserted claims, all but the 450, expressly require at a minimum that the content provider receive a communication from a handset, which is the point you're making, that's six of the seven claims. The 450 differs only that it omits some of the elements, so that it's even broader, and therefore if the other is exhausted, it should be a fortiori, because it's even broader, and it covers just a proportion of the same thing, but still block the same communications. But even the 450 Claim 1, for example, which seems to be their favorite claim, the preamble says that it is a method of providing content to a cell phone. It goes on to require a provider to initiate a page to a content subscriber, and to have a system that can be contacted to trigger retrieval of the content. That one in particular, I think the blue brief prints two content claims. That one, I gather, carefully selected so that actually no action by the handset is required. The other one action is required, not by the defendants, but between steps, I don't know what it was, say three and four, so that the server can start sending the package down. I agree that for the 450 claims, hopefully I'm saying the question right. If not, I'm sure you'll let me know, but if I understand the question right, the 450 claims, it's true that they don't expressly refer to the actual receipt of a communication from a user. But they're entirely written about providing content to a cell phone, and the way in which that's done. The patent actually says, this is the 450 patent up front, the field of invention section identifies the invention as the handset. Which is why then their infringement allegations at 294 talk about the handset. Your principle here is, I think you probably started here, but maybe you can return to it, that when I sell a handset, say I sell it myself, it doesn't matter whether I license you to do it or just to sell it, then I'm now forbidden to assert what patents against whom? Any patents that would interfere with the intended license to use. I know there's some wiggle room in what interfere means, but that's the articulation this court had in Hewlett-Packard, and the basic point there is at a minimum, if asserting these claims would block that use. Even if the patent owner has a truly separate patented invention? I know there's a debate here in this appeal whether there's separately patentable inventions that are really interesting and unique and different, and so therefore of course those should be kept out of exhaustion. The devil's in the details in terms of what truly separable means. For example, if they had a patent on a new server, a server that was not tied to this method. It's just a really good computer server. It could do lots of things with it. This method could be performed with or without that server. That server could be used to do this or lots of other things. Sure, you have to buy a server separately. At that point, it may be a different scenario, but here there are no claims to any inventive hardware, for example. So if the pods in Keurig were separately patented because there was something really new, special, and interesting about the pods? Probably not because... Probably not what? Probably not exhausted? It would depend. It may not be because, as Keurig explains toward the end of the opinion, the whole point of the apparatus was to use those pods. There was a non-infringing type of pod, say one that had been previously punched, and it said still that doesn't defeat exhaustion because the normal intended use of the machine would be with these pods. The cases are different. I recognize there's a little wiggle room there, so it ends up sort of turning on the circumstances of the case as to what you mean by separable invention. But here, it's the same two-way method of communication. Some of the claims expressly call this a two-way communication section. And even with those restriction requirements, getting back to a point Judge Chen made, the restriction requirement they mostly rely on directly led to the 838 patent. That patent contains both types of claims. So in the end of the day, and in PTO also, in arguing that some of their content provider claims, or excuse me, transmission claims, were not obvious, they specifically relied on the handset manufacturer licenses as licenses to a transmission-only patent. So they were conflating all of their claims and patents as one for purposes of evidence of commercial success, of non-obviousness, of the invention as a whole. And that in this context is exactly right, because it takes two to tango. And as a result, Keurig then teaches us that at a minimum, the exhaustion covers all the claims in the same patent. I think I know what your answer is to this, but I want to make sure. I suppose instead of licensing, as you emphasized in your brief, the entire handset industry, or virtually the entire handset industry, there had been licensing here to only one or two handset manufacturers. What would your analysis of the exhaustion rights of the content providers be? It would be a scope issue. So for example, if Motorola had license, then there would be no infringement or damage with respect to communications. With respect to any communications there. Yeah. And I should let co-counsel take over. Thank you. Thank you. Your Honor, my colleague is of Maine Police Corps, Brian Beroker. My colleague has covered many of the points we wanted to address, but let me pick up on a few things. 450 patents, one of the asserted claims is claim 27. And that claim adds the requirement that there is a response received by the content supplier from the handset. So every one of these patents has at least one claim where there is a required use of a handset to engage. And that's one of the important distinctions over Aiken and those other cases. The claims here are clearly written to a two-way communication. Each of the sets of claims refers to the other aspect. It's hard to imagine a way in which they could be more intertwined. Even the claim 450 claim 1 that they point to, the method is a method of providing content to a cell phone. It is not described as a method of managing content. That's one of the things it does. But it is a method of communicating. It is the second side of the two-way communication. And that is an important distinction over those cases. If you take a step back and look at the exhaustion doctrine and what it's intended to prevent, it is restriction on the use of an item. It doesn't say who the user has to be. It's just we don't want to put restrictions of use for the intended purpose for which the item was sold. Is it your view that your clients use the handsets in practicing most of the claims? Well, in the terms of centillion in this court's decision of use that requires control of the handsets, we do not control the handsets. But do we engage in an activity that benefits from the use of the handset? Absolutely. We would not be able to communicate a text message with the accused technology. A text message that has a link in it. We would not be able to receive a response to that text message with a link if it were not for the existence of the handsets that have been licensed. And that's an important point. The act of infringement that's been accused here would never happen if it were not for the use by a consumer of a handset that was purchased by the consumer. And that's the use. As to at least, maybe even most of the claims, but not as to the 450, number one. Well, we would argue at least all of them. Claim 450, still there has to be an information identifier that includes an address to be triggered. If there isn't a system that can cause the triggering, one would wonder how you could ever meet this claim limitation. Because it's the fact that the phone, in the accused infringing scenario, they argue that the fact that the phone can recognize a set of characters as a URL and render that URL as a link, that is what makes that content information that can be caused to trigger retrieval. So if a phone didn't exist that would allow the URL to be recognized, then you couldn't infringe even claim one of the 450. And that's why that language is important. That's one of the reasons why they got this claim allowed over the art was that it included, and all of the claims on the content side, the transmission of content side, have this limitation that there is an information identifier that enables the handset manufacturer to trigger content. That's what the real invention was. If you look at the field of the invention, that's what they said. On A285, I just picked the 450 patent. The field of the invention is that the present invention relates generally to paging transceivers and methods for selectively acting on messages. It's the ability of the phone to be able to selectively act on that message that has the link in it, that they told the patent office, at least in the field of the invention, was the real invention. So that's definitely one of the points I wanted to make. I think Mr. Gould is pointing to some standard that is narrower than the interfere with the intended use. Is that right? Are you pointing to some narrower standard? Well, Your Honor, I'm pointing to the way in which you determine whether there's been an interference of use is to look at the asserted claims and the accused infringing activity and determine whether or not a use is based. That's exactly what we have. That's one of the major differences between the claims in this case and the assertions in this case in Aiken, where if you look at the Aiken patent, you can pull it up on the patent office website. It's very old, but the knitting needle patent that was at issue there made no reference to the machine. It was just the knitting needle standing alone. Here you've got claims that clearly refer to the use of a handset in order for any activity to occur for infringement, and that's an important distinction. The other issue here, too, the other distinction between those cases we wanted to point out is here all the claims stem from the same common specification, and that is not true with the Aiken cases, the other ones you've cited. And to put a finer point on it, that's exactly the point of curate, was to say if you allow a party to carve up and assert certain claims, you will have an end run around exhaustion. If you allow parties to file separate applications all off the same specification in the way in which we have here, you can get around exhaustion because you will be able to recover two royalties, one from the handset manufacturer in this case, one from the content providers in this case, all for the exact same communications. Every time there is a communication back and forth between a content provider and a handset provider, that should be licensed because the handset provider has paid for the ability of users to receive the message, but can only get content. What you just said, how does that apply to Judge Bryson's walkie-talkie example? In that case, it would depend on the claims at issue in the patent, whether the claims in the walkie-talkie... My answer would be the same as his. It depends, but I think in that case, if the two walkie-talkies, if the claims at issue there required communication with another walkie-talkie, then I think that you could have exhaustion as to the individual transactions at issue because Judge Bryson paid for his walkie-talkie. He should be able to communicate with another person, and at least as to his communications, there should be exhaustion. It's going to make the first walkie-talkie very expensive. Yes, Your Honor. Thank you. Thank you. How about four minutes? I'll take what I can get, Your Honor. Not a negotiation, I guess. I think that Your Honor's questions have actually focused in on the difficulty with the formulation that the defendants would ask you to accept with regard to exhaustion doctrine, which is that a proposition that anything that a patent owner does to enforce separate patents that may interfere with the use of an article that has been fulfilled pursuant to an authorized sale, that somehow exhaustion doctrine has anything to say about that, would be an extraordinarily broad expansion of the doctrine in a way that has simply never been recognized by any case, and the cases, like the needle case, are to the contrary. There's a suggestion Mr. Joseph had tried to come up with a distinction by saying, well, in that case, when you say the needle case would not have been different if the sample needles had not been included, it would be perfectly possible for the patent owner to sell the machine and then sell separately needles, and the holding that the purchase of the machine doesn't give you a right to practice the patent to the needles doesn't change by virtue of that. And I think that when Mr. Broker acknowledged that the accused infringers do not use the patent sets in practicing the assertive patents, that's really critical and the basis upon which this court can decide this case. Again, exhaustion doctrine has its roots in restraints on alienation, the idea that when you sell personal property, you cannot retain property rights through property law to restrain the use or sale of that device. And that's what exhaustion doctrine prevents, and I think Quanta makes clear that it's a property rule that is powerful where it applies. But where a claim of patent infringement does not depend on the alleged infringer's use of the article that was sold, the policy behind the doctrine is not implicated. Again, there are other policies that might someday be important, and it's significant that when you look at the Ethel case, that that's a case about whether there's an exhaustion case. The HP case is a case about permissible repair, not an exhaustion case. And exhaustion doctrine should be appropriately confined to the context of a circumstance where there's an effort to prevent use or sale of an article that was acquired through an authorized sale. And since that's not happening here, exhaustion doctrine is really categorically inapplicable, unless the Court has questions. Thank you. Case is submitted.